# 24-2333

### In the
# United States Court of Appeals
## For the Second Circuit

❖

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

— v. —

JUAN REYES and CATHERINE REYES,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (BROOKLYN)

## BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANTS-APPELLANTS

MAZZOLA LINDSTROM LLP
*Attorneys for Defendants-Appellants*
1350 Avenue of the Americas, 2nd Floor
New York, New York 10019
(646) 250-6666
jeanclaude@mazzolalindstrom.com

# **<u>TABLE OF CONTENTS</u>**

**Page**

Table of Authorities ................................................................. ii

Preliminary Statement ...............................................................1

Basis for Appellate Jurisdiction .................................................2

Standard of Review .....................................................................2

Questions Presented ....................................................................5

Statement of Facts and Relevant Procedural History ................6

Argument

Point I.  The Trial Court Erred in Granting Summary Judgment,
Where the Defendants Raised a Triable Issue of Fact as to
Whether they Willfully Failed to File FBAR Forms with
Their Tax Returns ...................................................18

Point II. As 31 USC 3717(e)(d) Includes the Word "Judicial," and
States that the Judicial Branch May Impose Late Payment
Penalties of Up to 6%, the District Court Clearly Erred in
Holding that it Lacked Discretion to Impose a Lower
Interest Rate ...........................................................25

Conclusion ...........................................................................27

i

<u>**TABLE OF AUTHORITIES**</u>

Page

<u>**Cases:**</u>

*Allen v. Coughlin,*
  64 F.3d 77 (2d Cir. 1995)...................................................................3

*Art & Antique Dealers League v. Seggos,*
  121 F.4th 423 (2d Cir 2024)...........................................................25

*Bedrosian v. United States,*
  42 F.4th 174 (3d Cir. 2022) ("Bedrosian II") ...............................14

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
  467 U. S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)...........25, 26

*Clements v. Nassau County,*
  835 F.2d 1000 (2d Cir. 1987)............................................................3

*Comiskey v. Pennsylvania R. Co.,*
  228 F2d 687 (2d Cir 1956)...................................................... 4, 26-27

*Fairmount Glass Works v. Cub Fork Coal Co.,*
  287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439.......................................4

*Felton v. Spiro,*
  6 Cir., 78 F. 576................................................................................4

*Hart v. Rick's Cabaret Int'l,*
  967 F.Supp.2d 901 (S.D.N.Y. 2013)..............................................20

*Hochstein v. United States,*
  900 F.2d 543 (2d Cir. 1990)..............................................................4

*Jarnagin v. United States,*
  134 Fed. Cl. 368 (2017) ..................................................................19

*Kimble v. United States,*
  991 F.3d 1238 (Fed. Cir. 2021)..................................................12, 13

*Lefcourt v. United States,*
    125 F.3d 79 (2d Cir. 1997)................................................................ 3-4

*Loper Bright Enterprises v. Raimondo,*
    144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024)...............................25, 26

*Noriko Ozawa v. Orsini Design Assocs.,*
    2015 U.S. Dist. LEXIS 29933 (S.D.N.Y. 2015)...............................20

*Norman v. United States,*
    942 F.3d 1111 (2019)........................................................................14

*Perez v. Rossy's Bakery & Coffee Shop,*
    2021 U.S. Dist. LEXIS 61289 (S.D.N.Y. 2021).............................21

*Rocha v. Bakhter Afghan Halal Kababs,*
    44 F.Supp.3d 337 (E.D.N.Y. 2014) ...............................................21

*Rupp v. Buffalo,*
    91 F.4th 623 (2d Cir. 2024)..........................................................3, 24

*Safeco Ins. Co. of Am. v. Burr,*
    551 U.S. 47 (2007) .............................................................................3

*Skidmore v. Swift & Co.,*
    323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944).........................26

*Skubikowski v. Morena,*
    190 F.R.D. 305 (N.D.N.Y. 2000)......................................................3

*Solis v. SCA Rest. Corp.,*
    938 F.Supp.2d 380 (E.D.N.Y. 2013) ..............................................20

*United States v. Bittner,*
    19 F.4th 734 (5th Cir. 2021)............................................................19

*United States v. Gentges,*
    531 F. Supp. 3d 731 (S.D.N.Y. 2021)...........................11, 12, 13, 14

*United States v. Granda,*
    565 F.2d 922 (5th Cir. 1978).................................................................23

*United States v. Horowitz,*
    978 F.3d 80 (4th Cir. 2020).........................................11, 12, 13, 14

*United States v. Katholos,*
    No. 17-CV-531, 2022 WL 3328223 (W.D.N.Y. Aug. 10, 2022) ....................11

*United States v. Schwarzbaum,*
    23 F.4th 1355 (11th Cir. 2022) ........................................................22

*Wakefield v. Northern Telecom.,*
    813 F.2d 535 (2d Cir. 1987)..............................................................3

## Rules, Laws and Statutes:

26 U.S.C. § 6672 ...........................................................................3

28 U.S.C. § 1291 ...........................................................................2

31 C.F.R. § 5.4 .............................................................................16

31 C.F.R. § 5.5 .............................................................................16

31 C.F.R. § 901.9 ..........................................................................16

31 U.S.C. § 3717 ..................................... 5, 15, 16, 17, 25, 26, 27

31 U.S.C. § 5314 ...........................................................................7

31 U.S.C. § 5321 ......................................................3, 7, 11, 14, 23

Fed. R. Civ. P. 56 .....................................................................1, 2

## Preliminary Statement

This brief is respectfully submitted on behalf of defendants Juan Reyes and Catherine Reyes, who appeal from the final judgment rendered herein on August 5, 2024 (SPA-1; JA-979), and the decisions and orders upon which the judgment is based, including,

a) The order of January 10, 2024 (SPA-3; JA-828) granting summary judgment against the Reyeses, pursuant to Fed. R. Civ. P. 56(a), regarding plaintiff United States' allegations that defendants willfully violated the requirement to file a Report of Foreign Bank and Financial Accounts ("FBAR") with respect to their jointly held foreign bank account during the 2010-2012 tax years; and

b) The order of May 21, 2024 (SPA-21; JA-873), which granted plaintiff government's motion to reopen the case in order to impose additional interest and late-payment penalties of 6%.

The main point of error on appeal is that the district court took from the jury the fact-finding role, and decided as a matter of law that the defendants had a reckless mental state with respect to the moneys held by the Reyeses in a foreign bank account, the principal having been earned entirely in Nicaragua by Juan Reyes' parents, and such principal had been transferred out of Nicaragua and into the name of Dr. Reyes (with his wife Catherine later being added as a named

1

account owner) so that his parents could avoid the confiscation of their assets by the Communist regime in Nicaragua. Dr. and Mrs. Reyes sated in their declarations submitted in opposition to the government's motion for summary judgment that they didn't believe that they had to report the money to the United States because it was earned by Dr. Reyes's parents in Nicaragua, and that they didn't believe it was subject to U.S. taxation. The district court deemed such a belief to have been reckless, taking the issue of their mental state out of a jury's hands, and granted summary judgment to the government. Additionally, given the Reyeses' age and other circumstances, discussed below, it is respectfully submitted that the district court had the discretion to impose a lesser penalty, and that the court erred, as a matter of law, in finding that it lacked such discretion.

## Basis for Appellate Jurisdiction

As this is an appeal from a final judgment dated on August 5, 2024 (SPA-1; JA-979), and a timely notice of appeal was filed on August 30, 2024 (JA-881), this court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## Standard of Review

With respect to the order granting summary judgment, Federal Rule of Civil Procedure 56(a) states that summary judgment should only be granted to the moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Once the

moving party has shown that there is no genuine issue of material fact, the burden shifts to the nonmoving party to show that a genuine issue of fact does remain for trial and should be determined by a trier of fact. A motion for summary judgment may only be granted if no reasonable trier of fact could find in favor of the nonmoving party. *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995). It is well settled that summary judgment is inappropriate "when the defendant's state of mind is at issue." *Skubikowski v. Morena*, 190 F.R.D. 305 (N.D.N.Y. 2000); *Clements v. Nassau County*, 835 F.2d 1000, 1005 (2d Cir. 1987); *Wakefield v. Northern Telecom.*, 813 F.2d 535, 540 (2d Cir. 1987). Of course, the record must be viewed in the light most favorable to the party opposing summary judgment. *Rupp v. Buffalo*, 91 F.4th 623, 627 (2d Cir. 2024). The district court noted that the issue presented here – whether a taxpayer may be found to have acted "willfully" may be decided as a matter of law – is one of first impression in this circuit, stating: (SPA-12).

> Although the Second Circuit has not yet addressed the meaning of "willful" in the context of Section 5321(a)(5), the Supreme Court has stated that "where willfulness is a statutory condition of civil liability," it will generally be construed to include "not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 57 (2007) (collecting cases). The Second Circuit has also held that, for the purposes of 26 U.S.C. § 6672, which provides penalties for willful failure to collect and pay withholding tax, an "individual's bad purpose or evil motive in failing to collect and pay the taxes 'properly play[s] no part in the civil definition of willfulness.'" *Lefcourt v. United States,* 125 F.3d 79, 83 (2d Cir.

3

1997) (alteration in the original) (quoting *Hochstein v. United States,* 900 F.2d 543, 548 (2d Cir. 1990)…

With respect to the failure to allow for an interest rate of less than 6%, the district court failed to exercise discretion to award a lesser amount, and thus this case should, at the very least, be remanded so that the district court may exercise its discretion. *Comiskey v. Pennsylvania R. Co.*, 228 F2d 687, 688 (2d Cir 1956) ("[I]t appears from the record that Judge Noonan, through error as to the extent of his authority, failed to exercise his discretion to condition denial of a motion for a new trial upon remission of part of the verdict. While we do not decide how such discretion should be exercised, we find that its exercise is an important right, of which defendant may not be deprived. *Felton v. Spiro*, 6 Cir., 78 F. 576. See also *Fairmount Glass Works v. Cub Fork Coal Co.*, 287 U.S. 474, 483, 53 S.Ct. 252, 77 L.Ed. 439.")

## Questions Presented

**Question #1:**  Did the district court err in taking the fact-finding role from the jury, and instead determining, as a matter of law, that the defendants had a "wilfull" mental state – viz., the intent to willfully fail to file FBAR forms with their joint tax returns?

**Answer:**  Yes, the district court erred in taking the factfinding role from the jury, as the defendants presented a reasonable explanation as to why they did not believe that they were required to file FBAR forms.

**Question #2:**  Did the district court err, as a matter of law, in determining that it lacked the discretion to impose a lesser late-payment interest penalty upon the defendants.

**Answer:**  Yes, as the statute – 31 USC 3717(e)(2) – includes the word "judicial," stating that late payment penalties of "up to 6%" shall be imposed, the district court clearly erred in holding that it lacked discretion to impose a penalty of less than 6%, instead deferring to the government's position that Treasury Department's 6% number removes any discretion it might otherwise have.

## Statement of Facts and Relevant Procedural History

The government filed its complaint herein against the Reyeses on October 7, 2021 (JA-1). In the complaint, the government acknowledged that Dr. Reyes was born in Nicaragua and has lived in the United States for more than sixty years, and that in 1972, his *parents* opened an account in his name with the Banco de Londres y America which became a part of Lloyds Bank, and ultimately Lloyds TSB Bank in Switzerland. (JA-9, ¶¶ 5-7). Dr. Reyes's parents, who passed in about 2003, owned a bakery and cotton plantation in Nicaragua. (JA-135). The government further alleged that around 2000, Mrs. Reyes' name was added to the account as a joint owner. (JA-9, ¶ 7). The gravamen of the government's claim is that when the Reyeses filed their joint tax returns for years 2010, 2011 and 2012, they failed to report the foreign bank account, having checked "no" on the box on the tax returns that asked whether they had an interest or signature authority over a financial account in a foreign country (JA-9, ¶ 8), and failed to report income therefrom. (JA-10, ¶ 10). They checked "no" because they didn't believe that they had an obligation to report the account, as the money was not generated in the U.S. (JA-186). The Reyeses first realized that they had an FBAR reporting obligation when they sought to close the foreign account and bring the money into the United States in around late 2013 or early 2014, having come to the realization that the political situation in Nicaragua would not change, making the plans to retire to Nicaragua

6

unrealistic, and deciding to use the money in the U.S. to renovate their property. (JA-147-149, 214-216, 223-224, 293). At his deposition, Dr. Reyes explained that, as a dual American and Nicaraguan citizen, he did not believe that his parents' Nicaragua-derived funds were subject to U.S. taxation, and that he had read articles and spoken casually with "international lawyers" (*i.e.*, non-U.S. attorneys) on the topic that corroborated this belief, albeit now known to be a mistaken belief. (JA-250-256, 260, 278-279). The government alleged that Dr. Reyes and Mrs. Reyes had acted willfully, within the meaning of 31 U.S.C. § 5321(a)(5), in not reporting the foreign account. (JA-10, ¶17; JA-13, ¶33). The government sought penalties pursuant to 31 U.S.C. § 5321(a)(5)(C), which provides:

> (C) Willful violations.—In the case of any person willfully violating, or willfully causing any violation of, any provision of section 5314—
>
> (i) the maximum penalty under subparagraph (B)(i) shall be increased to the greater of—
>
> (I) $100,000, or
>
> (II) 50 percent of the amount determined under subparagraph (D), and
>
> (ii) subparagraph (B)(ii) shall not apply.

Based upon the amounts of money held in the account during years 2010, 2011 and 2012, the government sought civil penalties of $420,051.00, as against Dr. Reyes (JA-11, ¶22), and the same against Mrs. Reyes (JA-14, ¶38), as well as

late payment penalties of $44,467.86 against each, plus interest. (JA-12, ¶24; JA-14, ¶40).

The Reyeses timely answered on March 4, 2022 (JA-21), denying the material allegations therein – *viz.*, that they had acted willfully. Documentary discovery and depositions followed, and the government moved for summary judgment on February 28, 2023 (JA-26), contending that the Reyeses had acted willfully. (The amount of money held in the account during the relevant periods was not disputed). The Reyeses opposed the motion on April 11, 2023 (JA-799), contending that they had not acted willfully. In his sworn declaration submitted in opposition to the motion, Dr. Reyes stated: (JA-804-807)

3. The motion should be denied because I had no intention of defrauding the United States of America in not reporting my foreign bank account on my joint income tax returns for the years 2010, 2011, and 2012.

4. The funds that were kept in the Lloyds Bank account, which is the subject of this litigation, were originally housed in a Nicaraguan bank account with Banco de Londres y America del Sor which was opened by my mother and father – citizens and residents of Nicaragua – around 1972.

5. It was my parents' wish that my wife and I use the money to move back to Nicaragua and build a home there.

6. Due to the volatile political climate in Nicaragua, however, my parents feared that the funds would be confiscated by the government.

7. Rather than take this risk, my parents decided to move the money out of the account in Nicaragua and place it in a new account under my name, as I was no longer a resident of the country at that time. However, the money was not intended to be used until I moved

8

back to Nicaragua with my wife once the political unrest had subsided.

8. The funds were originally transferred into an account with the London office of Banco de Londres. Banco de Londres then became part of Lloyds Bank in London. Then the funds were transferred into an account with Lloyds TSB Bank plc, Zurich and then finally moved to an account in Geneva, Switzerland, where they remained until 2014 when I sought to move the funds into an account in the United States.

9. While I have been a United States citizen since 1982, the money was not intentionally kept out of the United States.

10. This was money that belonged to my parents and was moved to foreign countries to avoid being confiscated by the Nicaraguan government.

11. The money was transferred out of Nicaragua prior to my naturalization in the United States. We chose to leave the money in this foreign account to comport with my parents' wishes that it be saved until I could return to Nicaragua with my wife.

12. Unfortunately, the political climate in Nicaragua did not improve – rather, it worsened with the Communist takeover of the country in about 1979 – and so I have not moved back to Nicaragua with my wife.

13. I am not trained in the law, much less tax law. While I had had informal conversations with international lawyers and had read information in Spanish-language sources, I did not think there was a real issue with the foreign account, because the money in the foreign account at issue never had any connection to the United States – such moneys having been earned in Nicaragua by my parents, and had only ever been housed in bank accounts outside of the United States. I truly believed that I was not required to report it to the United States on my and my wife's joint income tax returns because the money in the account was earned outside the United States by my parents.

14. It was my understanding that I would have been required to pay taxes on the funds in the Lloyds Bank account when I transferred the funds to an account in the United States, which I attempted to do in 2014.

15. I did not review the FBAR reporting requirements at any time prior to filing my income tax returns for the years 2010-2012.

16. If I had known that I was required to report the foreign bank account that happened to be in my name on my income tax returns, I would have, as I have never had any intention of violating United States law.

17. Once we embarked on the path of having the funds transferred to a bank account in the United States, and after being provided further legal advice, my wife and I disclosed the account to the Internal Revenue Service.

18. My intention never was to lie to the United States, hide our foreign bank account, or avoid paying the requisite taxes in the United States. I simply believed it was not required because the money had no connection to the United States, having been earned by my parents, and having been put in the name of my wife and me and transferred out of Nicaragua so that the government of Nicaragua would not seize the money.

Mrs. Reyes' declaration submitted in opposition to the motion for summary judgment mirrored her husband's, explaining that the money derived from her husband's parents' Nicaraguan assets and was intended to be returned to Nicaragua in order that she and her husband could one day build a house and relocate there. (See JA-808-811).

The government submitted its reply papers on May 1, 2023 (JA-823), contending that the Reyeses' mental state was reckless, and arguing that such recklessness constituted willfulness within the meaning of the afore-cited statute, and that the penalties sought, plus interest, was appropriate. Totally ignoring that the Reyeses had the belief – albeit incorrect in hindsight – that the Nicaraguan

funds were not subject to U.S. taxation, the district court viewed their actions in the light most unfavorable to them.

Of course, the district court, and the government, have far more sophistication than laymen, as are the Reyeses, but there remains no basis in this record to find that *the average person* would have thought that such moneys were subject to U.S. taxation. The district court held the Reyeses to an as-a-matter-of-law objective standard, stating: (SPA-13-14)

> In the civil context, recklessness "encompasses an objective standard - specifically, 'the civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *[United States v. Gentges*, 531 F. Supp. 3d 731, 744 (S.D.N.Y. 2021)] (quoting [*United States v. Horowitz,* 978 F.3d 80, 89 (4th Cir. 2020)]; [*United States v. Katholos*, No. 17-CV-531, 2022 WL 3328223, at *8 (W.D.N.Y. Aug. 10, 2022)], at *8 (same). In the context of Section 5321, "willfulness is established if 'the defendant (1) clearly ought to have known that (2) there was a grave risk that an accurate FBAR was not being filed and if (3) he was in a position to find out for certain very easily.'" *Katholos,* 2022 WL 3328223, at *8 (quoting *Horowitz,* 978 F.3d at 89).

The district court surveyed decisions of other courts, culling from the cases *general* principles that are not disputed, but that are inapplicable to Dr. and Mrs. Reyes, unsophisticated laymen who had the good-faith belief that there was no obligation to report entirely foreign-generated funds. The district court stated: (SPA-14-15)

> Construing the evidence in Defendants' favor, Defendants "entrusted the preparation and filing of their tax returns to their long-time

accountant and did not review the tax returns or sign them prior to filing." (Defs.' 56.1 ¶32.) Defendants argue that this demonstrates that their failure to file an FBAR was not willful. (Defs.' Mem. 3.) However, "most courts have held that where ... a defendant provides false information regarding foreign bank accounts by failing to review carefully his income tax return, that defendant has shown reckless disregard toward, and thus has willfully violated, the FBAR reporting obligation." *Gentges,* 531 F. Supp. 3d at 745-46 (collecting cases) (concluding that the defendant's admission that he filed his income tax return "without any significant substantive review ... doom[ed] [his] argument on summary judgment"); *see also Kimble v. United States,* 991 F.3d 1238, 1242-43 (Fed. Cir. 2021) (concluding that the grant of summary judgment to the government was not clear error because the undisputed facts showed a willful violation where, among other things, the defendant did not review her tax returns before signing and filing them, and the tax returns stated that she had no foreign accounts); *Horowitz,* 978 F .3d at 90 (concluding that defendants acted recklessly in part because they "repeatedly failed to review the[ir] returns with the care sufficient at least to discover their misrepresentation of foreign bank accounts, while nonetheless stating that the returns were accurate" and that "such recklessness was only heightened by the fact that they understood that the tax returns represented only the information that they had provided to the[ir] accountant"). Defendants' failure to meaningfully review their tax returns before filing returns that inaccurately represented that they had no foreign accounts thus shows that they "recklessly disregarded the FBAR reporting obligation." *Gentges,* 531 F. Supp. 3d at 750.

Then, denying the Reyeses' their right to have a lay jury decide the issue, the district court agreed with the goverment, *every step of the way*, viewing the record in the light most *unfavorable* to the Reyeses, holding that they had acted recklessly, warranting the imposition of penalties and interest sought by the government for willful violation of the FBAR reporting requirement. The district court stated: (SPA-15-18)

[T]he undisputed facts show other indicia of recklessness. First, Defendants never asked their "long-time accountant" to whom they "entrusted the preparation and filing of their tax returns" whether they were required to report their foreign account, nor did they inform him that the foreign account existed, despite his attempt to collect that information via his "client organizer" questionnaires. (Defs.' 56.1 ¶ 32; Gov't 56.1 ¶¶ 24-25, 27, 35); *see, e.g., Gentges ,*531 F. Supp. 3d at 750-51 (noting that "courts have repeatedly held" that where a defendant does not disclose the existence of his foreign accounts or seek advice from his tax preparer regarding the accounts, "such an omission constitutes evidence of recklessness or willful blindness toward the FBAR reporting obligation"); *Horowitz,* 978 F.3d at 90 (affirming the grant of summary judgment in favor of the government where, among other things, the defendants failed to ask their accountant about their reporting requirements for their foreign account); *Kimble,* 991 F.3d at 1242-43 (concluding that the grant of summary judgment to the government was not clear error because the undisputed facts showed a willful violation where, among other things, the defendant "knew about the numbered account and took efforts to keep it secret by ... not disclosing the account to her accountant"). Defendants point to the fact that they relied on a news article in a Nicaraguan newspaper and informal conversations with "international lawyers" outside of the United States for their understanding that they did not have to report their foreign account, but "a defendant's subjective belief does not negate a finding of recklessness or willful blindness, particularly where, as here, a defendant could easily have determined whether his belief was accurate by speaking with a longtime tax preparer." *Gentges,* 531 F. Supp. 3d at 750; *see also Horowitz,* 978 F.3d at 89 ("[The defendants'] only explanation for not disclosing foreign interest income related to some unspecified conversations they had with friends in Saudi Arabia in the late 1980s. Yet, if the question of whether they had to pay taxes on foreign interest income was significant enough to discuss with their friends, they were reckless in failing to discuss the same question with their accountant at any point over the next 20 years.").

Second, although Defendants assert that they "do not recall ever having requested that Lloyds Bank keep mail related to their account," it is undisputed that they paid a fee to the Lloyds Account for a "keep

mail" service, under which the bank retained all account-related correspondence, rather than sending it to Defendants at their designated address in the United States. (Defs.' 56.1 ¶ 14; Gov't 56.1 ¶ 14.) Defendants also do not dispute that they signed documents directing the bank to sell all of their U.S. securities and not invest in further U.S. securities. (Gov't 56.1 ¶ 17; Defs.' 56.1 ¶ 17; Gov't Ex. K); *see also Gentges,* 531 F. Supp. 3d at 7 51 ("Also significant is the fact that both of [d]efendant' s foreign accounts were set up as numbered accounts with 'hold mail' service."); *Horowitz,* 978 F.3d at 90 (noting the defendants' use of the "hold mail" service for their foreign account); *Bedrosian v. United States,* 42 F.4th 174, 180 (3d Cir. 2022) *("Bedrosian II")* (noting that the defendant's foreign accounts were subject to a "mail hold" and that the undisputed facts of "the existence of the mail hold or that he signed a form and paid a fee to the bank for this benefit" were relevant to the question of whether he had willfully violated the FBAR reporting requirement); *Norman,* 942 F.3d at 1116 (concluding that, among other things, the defendant's signing of a "document preventing [her bank] from investing in U.S. securities on her behalf" was a step that "had the effect of inhibiting disclosure of the account to the IRS").

Finally, it is also undisputed that the balance of the Lloyds Account represented between 75% and 90% of Defendants' wealth during the years in question. (Gov't 56.1 ¶ 16; Defs.' 56.1 ¶ 16); *see Gentges,* 531 F. Supp. 3d at 752 (noting that the size of the accounts in question "were by no means small or insignificant and thus susceptible to being overlooked by" the defendant (quoting *Horowitz,* 978 F.3d at 90)); *Bedrosian II,* 42 F.4th at 180 (noting that the defendant had "also acknowledged that he was aware of the significant amount of money held in his foreign bank accounts").

Defendants' undisputed failure to review their incorrect tax returns in advance of the filing of the returns, as well as the additional undisputed evidence, demonstrate that they acted, at a minimum, recklessly when they failed to file FBARs in 2010, 2011 and 2012, and they are therefore subject to enhanced penalties for a willful violation under 31 U.S.C. § 5321(a)(5)(C). Accordingly, the Court grants the government's motion for summary judgment.

As discussed in the argument section of this brief, the district court failed to view the facts in the light most favorable to the Reyeses, the opponents of the motion for summary judgment. The court failed to view the facts in the light of their good-faith though incorrect belief that Dr. Reyes's parents' moneys – which were transferred out of Nicaragua to avoid political risk and communist confiscation, and which were, in sum, initially placed in Dr. and Mrs. Reyes's protective custody with the intent that the moneys be returned to Nicaragua – were not subject to U.S. taxation. The court viewed in the most unfavorable light that the moneys represented 75% to 90% of their assets, disregarding that this itself – if viewed most favorably to the Reyeses – showed their lack of business sophistication, having otherwise saved in the low six figures from Dr. Reyes's career as a physician for over half a century. Indeed, Dr. Reyes testified that he never paid attention to money. (JA-163). The court also viewed in the most unfavorable light the "keep mail" instructions to not send statements to the Reyeses, even though those instructions were from 1994 (JA-621), about twenty years before the events at issue herein.

As noted above, the district court granted summary judgment, finding that Dr. and Mrs. Reyes each pay $420,051, plus failure-to-pay penalties, interest, and other statutory accruals under 31 U.S.C. § 3717, bringing the total to $518,170.30, or a total, jointly, of $1,036,340.60. (SPA-19).

The government moved to re-open, in order to request an additional 6% penalty under 31 USC 3717(e), which provides: (emphasis added)

> (e)The head of an executive, *judicial*, or legislative agency shall assess on a claim owed by a person—
> \*\*\*
> (2) a penalty charge **of not more than 6 percent** a year for failure to pay a part of a debt more than 90 days past due.

The government argued that 31 C.F.R. 5.5(a) removed the statutory discretion available under 31 U.S.C. 3717(e)(2) to allow a lesser late-payment interest rate than 6%. The regulation states: (emphasis added)

### § 5.5 How will Treasury entities add interest, penalty charges, and administrative costs to a Treasury debt?

(a) Assessment and notice. Treasury entities shall assess interest, penalties and administrative costs on Treasury debts in accordance with the provisions of 31 U.S.C. 3717 and 31 CFR 901.9, on Treasury debts. Interest shall be charged in accordance with the requirements of 31 U.S.C. 3717(a). ***Penalties shall accrue at the rate of 6% per year, or such other higher rate as authorized by law.*** Administrative costs, that is the costs of processing and handling a delinquent debt, shall be determined by the Treasury entity collecting the Treasury debt. Treasury entities may have additional policies regarding how interest, penalties, and administrative costs are assessed on particular types of debts. Treasury entities are required to explain in the notice to the debtor described in § 5.4 of this part how interest, penalties, costs, and other charges are assessed, unless the requirements are included in a contract or repayment agreement.

In opposition to the imposition of a 6% interest, the Reyeses argued that while the statute allows discretion to impose a penalty of less than 6%, the regulation improperly purports to ***require a penalty of 6% or higher***, if the law allows. The Reyeses argued that the district court should impose a lesser penalty,

as they are already to be drastically penalized by the order granting summary judgment against them. It was further argued that Dr. Reyes, then 91 years old and still practicing medicine, and Mrs. Reyes (then 81 years old), do not have a retirement account, and that the money left to them by Dr. Reyes's parents was, essentially, to be used by them eventually in retirement. It was further argued that, because of the district court's summary judgment order, Dr. Reyes will never be able to retire, with most of the Nicaragua-derived funds being taken from them.

The Reyeses requested that the court exercise discretion, and hold that the additional penalty on top of the 50% exaction is unduly punitive and unwarranted. Notwithstanding that the word "judicial" is within the statute – "an executive, **judicial**, or legislative agency shall assess … (2) a penalty charge of not more than 6 percent a year for failure to pay a part of a debt more than 90 days past due" – and clearly has the discretion to award a lesser rate of interest, the district court held that it lacked such discretion, because Congress had left a gap for the Treasury Department fill in, and that its determination of the appropriate interest rate must control. (SPA-26). The court stated that "[d]efendants have pointed to no authority, and the Court has found none, indicating that it has the ability, in its discretion, to reduce the amount of a penalty applied pursuant to section 3717. The Court therefore denies Defendants' motion to reduce the prescribed six percent latepayment penalty, and applies the late-payment penalty at a rate of six percent to

Defendants' outstanding debt. [¶] The Court therefore grants the government's motion to reopen the case and enter judgment in the requested amount." (SPA-24-25).

As noted above, judgment was thereafter entered on August 5, 2024 (SPA-1), and the notice of appeal was timely filed thereafter on August 30, 2024. (JA-881).

Further facts will be subsumed in the argument section of this brief.

## Argument

**Point I:    The Trial Court Erred in Granting Summary Judgment, Where the Defendants Raised a Triable Issue of Fact as to Whether they Willfully Failed to File FBAR Forms with Their Tax Returns.**

The disputed issue in this case is whether the defendants *willfully* violated the requirement to file an FBAR disclosing their foreign bank account with their income tax returns for the years 2010-2012, as alleged in the complaint. The government argued that the defendants acted with a willful state of mind in that they "understood that interest income from *domestic* banks needed to be reported on their federal income tax returns." (See JA-46). However, both Dr. Reyes and Mrs. Reyes attested to the fact that they believed they were not required to report the existence of their *foreign* bank account and thus did not willfully violate the law. In this regard, Dr. Reyes stated. (See JA-804-811).

18

In *United States v. Bittner*, 19 F.4th 734 (5th Cir. 2021), the Fifth Circuit held that the district court did not err in deciding, as a matter of law, that the defendant taxpayer had acted with willful disregard of his FBAR reporting obligation because he was – in sharp contrast to the case at bar – a sophisticated businessman.

> As the district court observed, Bittner was undoubtedly *a sophisticated business professional. He held interests in dozens of companies, negotiated purchases of Romanian government assets, transferred his assets into holding companies, and concealed his earnings in numbered accounts*. He even once inquired about tax obligations as a Romanian citizen owning property in Brussels before purchasing investment properties. Bittner's business savvy makes his failure to inquire about his reporting obligations even more unreasonable. *See, e.g., Jarnagin [v. United States*, 134 Fed. Cl. 368] 378 (2017) ("A reasonable person, particularly one with the sophistication, investments, and wealth of the plaintiff, would have sought advice regarding his obligation to file an FBAR.")

19 F. 4th 734, 743 (internal quotes and citations omitted; emphasis added and cleaned up).

Here, the government failed to demonstrate that the Reyeses have any business sophistication; they are not business professionals. As the record demonstrates, Dr. Reyes is a physician, still serving an impoverished community in Brooklyn. (JA-865). Mrs. Reyes is a housewife. (See, *e.g.*, JA-630 "Spouses Occupation: Housewife"). Unlike the defendant in the *Bittner* case, the Reyeses did not "conceal their earnings." Rather, they simply did not believe that they had an obligation to report Dr. Reyes's parents' earnings, and, viewing the evidence in

19

this light, it is reasonable to find that they did not have to report the Nicaraguan funds to the government.

It is astonishing, for example, that the district court noted that the Reyeses' accountant had sent them a yearly tax organizer, a boilerplate set of papers that is sent as a matter of course by every accountant every year, and no doubt tossed in the garbage by every taxpayer every year. And if one does not have a reason to believe that one's parents' moneys which happen to be put in one's name are subject to U.S. taxation, it is perfectly understandable that one would not be on the forefront of one's consciousness when paying U.S. taxes.

Courts have left the question of a party's willfulness to commit an act to the trier of fact, as "willfulness involves a factual inquiry." *Noriko Ozawa v. Orsini Design Assocs.*, 2015 U.S. Dist. LEXIS 29933 (S.D.N.Y. 2015) (citing *Solis v. SCA Rest. Corp.*, 938 F.Supp.2d 380, 393 (E.D.N.Y. 2013)). Whether willfulness is a question of fact to be left to a jury depends upon whether the "evidence on which [the movant] principally rel[ied]" is "conclusive as to that point." *Hart v. Rick's Cabaret Int'l*, 967 F.Supp.2d 901 (S.D.N.Y. 2013). In *Noriko Ozawa*, the court denied the party's motion for summary judgment as to willfulness for such reason.

The Reyeses' testimony and their declarations, raise an issue of fact as to their alleged willfulness. Indeed, the Reyeses would have reported their foreign

bank account if they had known that they were required to do so, as Dr. Reyes explained (JA-293-294) and declarations of Juan Reyes and Catherine Reyes in opposition to plaintiff's motion for summary judgment – which itself negates the government's claim that they acted in a willful manner to, in sum, cheat the government. The evidence shows, and the jury may surely believe, that the defendants – unsophisticated laymen – were unaware of the reporting requirements when their accountant filed their 2010-2012 income tax returns.

The government relied on the fact that the Reyeses marked "no" to the question on their tax returns regarding whether they had a foreign bank account to claim that their conduct was willful. However, the Reyeses had not even reviewed their tax returns and did not believe that the money given to them by Dr. Reyes's parents were subject to U.S. taxation. In *Perez v. Rossy's Bakery & Coffee Shop*, 2021 U.S. Dist. LEXIS 61289 (S.D.N.Y. 2021), the court found that, in general, "tax returns are not dispositive and the veracity of those documents can be questioned," and where there is an "absence of a signature on the tax returns, combined with the absence of an affidavit from the tax preparer," they are not conclusive to the extent that the taxpayer may be estopped from introducing contrary factual assertions. *Id.*, citing *Rocha v. Bakhter Afghan Halal Kababs,* 44 F.Supp.3d 337 (E.D.N.Y. 2014). Here, defendants' unsigned tax returns – and even

if signed – would not be dispositive of their state of mind, as willfulness must be proved.

In *United States v. Schwarzbaum*, 23 F.4th 1355 (11th Cir. 2022), the court found that taxpayer Issac Schwarzbaum's conduct was willful because **he had actually reviewed the FBAR instructions** the first year he prepared an FBAR. While Schwarzbaum argued that his conduct was not willful because he had relied on his accountant's advice that he need not report a foreign bank account, the court found that he knew or should have known the contrary because he had actually reviewed the FBAR instructions. This is not the case in the matter at bar.

Though Schwarzbaum, like the Reyeses, relied on professional advice, the Reyeses had not reviewed the FBAR instructions prior to preparing their income tax returns. It was Shwarzbaum's review of the FBAR instructions that established willfulness on his part. In contrast, the Reyeses were unaware of the requirement to report their foreign bank account, as they did not review any FBAR instructions before filing. The Reyeses believed that foreign accounts were reportable only if they had a U.S. connection, as demonstrated in their affidavits and as otherwise testified to. The conduct that led to Mr. Schwarzbaum receiving a willful-violation penalty differs greatly from the Reyeses' conduct, in that they had never even heard of an FBAR requirement until they sought to domesticate the funds by moving them to the United States, after the reporting years at issue. Thus, the

Reyeses' failure to disclose their foreign bank account on their 2010-2012 income tax returns was not willful or at all intended to defraud the United States. At least, a jury should be permitted to so find.

Congress added the word "willful" to 31 U.S.C. § 5321 in order to hold accountable only those who committed truly intentional acts. Including "willful" in the statute reflects Congress's intent that the penalty be reserved for intentional conduct, or else it need not have included the term in the first place. *See United States v. Granda*, 565 F.2d 922 (5th Cir. 1978). FBAR violations were not meant to be strict-liability offenses. The court in *Granda* explained that Congress added the terms "knowing" and "willful" to remove "this regulatory statute out of the ranks of strict liability type crimes" and to "require proof of the defendant's knowledge of the reporting requirement and his specific intent" to commit a violation. Here, specific intent – the willful and intentional failure to file the FBAR – has not been proved. It has not even been shown that the defendants were aware of FBAR reporting requirements when the 2010-2012 tax returns were filed.

In the 2004 statutory amendment of 31 U.S.C. § 5321, Congress created a less severe penalty for instances where the taxpayer unintentionally violated the FBAR reporting requirement, as in the Reyeses' case. In fact, 31 U.S.C. § 5321(a)(5)(B)(ii) provides an exception to liability when the "violation was due to reasonable cause." Thus, willfulness as used in the statute – and as alleged herein –

23

must mean voluntary, conscious, intentional conduct; otherwise, the inclusion of the word "willful" in the statute would be redundant and thus unnecessary. Using "willful" to describe one's *unintentional* acts contradicts policy created to address *intentional* acts that are violative of the statute.

Guided by the "light most favorable" to the Reyeses, *Rupp v. Buffalo*, 91 F.4th at 627, this Court should vacate the judgment, and allow the jury to decide whether the Reyeses acted "willfully" to hide from the U.S. Treasury the money that Dr. Reyes's parents were able to get out of Nicaragua, and put in Dr. Reyes's name. Based upon the evidence presented, and viewing the evidence in the light most favorable to the Reyeses, a jury should be permitted to find that they did not act willfully to cheat the United States.

Despite the government's argument to the contrary, there is a genuine dispute between the parties as to whether the Reyeses' conduct was willful. A reasonable trier of fact could find in their favor, crediting that they were unaware of their legal obligation to report the foreign bank account that was set up by Dr. Reyes's parents in order to protect the moneys from seizure by the communist government of Nicaragua.

**Point II:** **As 31 USC 3717(e)(d) Includes the Word "Judicial," and States that the Judicial Branch May Impose Late Payment Penalties of Up to 6%, the District Court Clearly Erred in Holding that it Lacked Discretion to Impose a Lower Interest Rate.**

The district court erred in finding (at SPA-24-25) that it had no discretion to depart from the Treasury Department's interpretation of 31 USC 37171(e)(2), whereby Treasury adopted a regulation requiring an imposition of an penalty interest rate of 6%, where the statute allows the court to impose a lower rate.

Section 3717(e)(2) provides: (emphasis added)

> (e) The head of an executive, *judicial*, or legislative agency shall assess on a claim owed by a person—
> **\*\*\***
> (2) a penalty charge *of not more than 6 percent* a year for failure to pay a part of a debt more than 90 days past due.

As noted above, the district court deferred to the Treasury Department's regulation, rather than heeding the statute itself, which provides that the "judicial" branch may impose a late payment interest rate of no more than 6%, and held that the court lacked discretion to impose a lower interest rate. (SPA-24-25). The court erred in giving deference to the Treasury Department, rather than exercising its own discretion in awarding a lesser interest rate, as the statute permits. Recently, in the post-*Chevron* case of *Art & Antique Dealers League v. Seggos*, 121 F.4th 423, 435 (2d Cir 2024), this Court stated:

> Since the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024), terminating the

25

era of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), the importance of agency interpretations of statutes is much diminished. "The [Administrative Procedure Act] . . . codifies," the *Loper* Court wrote, "for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." 144 S. Ct. at 2261. HN26 An administrative agency does not have authority to pass regulations that are inconsistent with the meaning of a statute. The fact that the implementing regulations at times fail to observe the distinction drawn by the Act between "exception" and "exemption" does not mean that the statute uses these words interchangeably. In the post-*Chevron* era, regardless of whether a statute is deemed to be ambiguous or unambiguous, interpretation of the statute is a question of law, and accordingly, it is the court, and not the administrative agency, that determines its meaning. *See id.* While the court may of course be persuaded by the correctness of the agency's interpretation, *see Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40, 65 S. Ct. 161, 89 L. Ed. 124 (1944), the court is not required to defer to the agency's interpretation. *Id.* The court makes its own determination of the meaning of ambiguous provisions. *Loper Bright*, 144 S. Ct. at 2273.

Under the language of 3717(e)(2, the "judicial" branch shall impose a penalty of "not more than 6%," such phrasing clearly signifying that the judiciary does have the discretion to impose a lower rate than 6%, and need not defer to an agency's determination of what 3717(e)(2) means. While the district court issued its decision a month before *Chevron* was overruled, the Reyeses did argue below that the court did have such discretion to impose a lower rate, and has thereby preserved the issue for appellate review. Accordingly, inasmuch as the district court failed to exercise the discretion that it quite certainly had, its failure to exercise such discretion constitutes an as-a-matter-of-law error, see *Comiskey v.*

*Pennsylvania R. Co.*, 228 F2d 687, 688 (2d Cir 1956), warranting vacatur of the judgment and remand for the court to exercise its own discretion, unbound by the Treasury Department's interpretation of section 3717(e)(2).

## Conclusion

For all the foregoing reasons, the judgment rendered herein on August 5, 2024 must be vacated, and the matter remanded for a new trial and, if warranted, a discretionary determination of the appropriate late payment interest rate to apply.

Dated:      New York, New York
            February 7, 2025

Respectfully submitted,

MAZZOLA LINDSTROM, LLP

By: */s/ Jean-Claude Mazzola*
Jean-Claude Mazzola
1350 Avenue of the Americas, 2d Fl.
New York, New York 10019
646.250.6666
jeanclaude@mazzolalindstrom.com

*Attorneys for Defendants-Appellants*
*Juan Reyes and Catherine Reyes*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because:

   This brief contains 7,209 words, excluding the parts of the brief exempted by Fed.R.App.32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P32(a)(6) because:

   This brief has been prepared in Proportionally-Space typeface using Microsoft Word, in Times New Roman, Font Size 14.

Dated: February 7, 2025

**SPECIAL APPENDIX**

i

# Table of Contents

**Page**

Judgment of The United States District Court for
The Eastern District of New York, Dated August 5, 2024,
Appealed From (DE36)............................................................SPA-1

Memorandum and Order of Honorable Margo K. Brodie,
Dated January 10, 2024 (DE25)................................................SPA-3

Memorandum and Order of Honorable Margo K. Brodie,
Dated May 21, 2024, Appealed From (DE35)..........................SPA -21

SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                    Plaintiff,                                    JUDGMENT

                    v.                                                            21-CV-5578 (MKB)

JUAN REYES and CATHERINE REYES,

                                    Defendants.
------------------------------------------------------------------X

     A Memorandum and Order of Honorable Margo K. Brodie, United States District Judge,

having been filed on May 21, 2024, granting the government's motion to reopen the case and

directing the Clerk of Court to enter judgment against (1) Dr. Juan Reyes in the amount of

$518,170.30 plus statutory additions, including (a) interest accruing pursuant to 31 U.S.C. §

3717(a)(1) from and after February 21, 2023, until the date of entry of the judgment, (b) interest

accruing pursuant to 28 U.S.C. § 1961(a) from and after the date of entry of the judgment until

the judgment is fully paid, and (c) late-payment penalties accruing pursuant to 31 U.S.C. §

3717(e)(2) from and after February 21, 2023, until the judgment is fully paid; and (2) Catherine

Reyes in the amount of $518,170.30 plus statutory additions, including (a) interest accruing

pursuant to 31 U.S.C. § 3717(a)(1) from and after February 21, 2023, until the date of entry of

the judgment, (b) interest accruing pursuant to 28 U.S.C. § 1961(a) from and after the date of

entry of the judgment until the judgment is fully paid, and (c) late-payment penalties accruing

pursuant to 31 U.S.C. § 3717(e)(2) from and after February 21, 2023, until the judgment is fully

paid; it is

     ORDERED and ADJUDGED that the government's motion to reopen the case is granted;

that judgment is hereby entered against (1) Dr. Juan Reyes in the amount of $518,170.30 plus

statutory additions, including (a) interest accruing pursuant to 31 U.S.C. § 3717(a)(1) from and

SPA-2

after February 21, 2023, until the date of entry of the judgment, (b) interest accruing pursuant to 28 U.S.C. § 1961(a) from and after the date of entry of the judgment until the judgment is fully paid, and (c) late-payment penalties accruing pursuant to 31 U.S.C. § 3717(e)(2) from and after February 21, 2023, until the judgment is fully paid; and (2) Catherine Reyes in the amount of $518,170.30 plus statutory additions, including (a) interest accruing pursuant to 31 U.S.C. § 3717(a)(1) from and after February 21, 2023, until the date of entry of the judgment, (b) interest accruing pursuant to 28 U.S.C. § 1961(a) from and after the date of entry of the judgment until the judgment is fully paid, and (c) late-payment penalties accruing pursuant to 31 U.S.C. § 3717(e)(2) from and after February 21, 2023, until the judgment is fully paid.

Dated: Brooklyn, New York
      August 5, 2024

Brenna B. Mahoney
Clerk of Court

By:   _/s/Jalitza Poveda_
      Deputy Clerk

SPA-3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

UNITED STATES OF AMERICA,

                          Plaintiff,                  **MEMORANDUM & ORDER**
                                                    21-CV-5578 (MKB)

        v.

JUAN REYES and CATHERINE REYES,

                          Defendants.

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff the United States of America commenced the above-captioned action against

Defendants Dr. Juan Reyes and Catherine Reyes on October 7, 2021.  (Compl., Docket Entry

No. 1.)  The government asserts claims pursuant to 31 U.S.C. §§ 3711(g)(4)(C) and 5321(a)(5) to

collect outstanding civil penalties it alleges Defendants owe due to their failure to timely file a

Report of Foreign Bank and Financial Accounts ("FBAR") to report their financial interest in a

jointly-held foreign financial account from 2010 to 2012.  (Compl. ¶¶ 7–9, 16, 32.)

        The government moves for summary judgment, pursuant to Rule 56 of the Federal Rules

of Civil Procedure, as to its claims against both Defendants.[1]  For the reasons set forth below, the

Court grants the government's motion for summary judgment.

---

[1]  (Gov't Not. of Mot. for Summ. J. ("Gov't Mot."), Docket Entry No. 22-1; Gov't Mem. of Law in Supp. of Gov't Mot. ("Gov't Mem."), Docket Entry No. 22; Gov't Reply Mem. in Supp. of Gov't Mot. ("Gov't Reply Mem."), Docket Entry No. 22-49; Defs.' Mem. of Law in Opp'n to Gov't Mot. ("Defs.' Mem."), Docket Entry No. 24-1.)

SPA-4

I.   **Background**

　　a.   **Factual background**

The following facts are undisputed unless otherwise noted.[2]

　　i.   **The Lloyds Account**

Defendants are United States citizens. (Gov't 56.1 ¶¶ 1–2.)  In or around 1972, Juan's[3] parents opened a bank account in his name in Nicaragua at Banco de Londres y America del Sur ("Banco de Londres").  (*Id.* ¶ 9.)  Juan's parents provided the initial funds to start the bank account, which totaled approximately $200,000.  (*Id.*)  Banco de Londres became part of Lloyds Bank, and on or about April 19, 1994, Defendants established the account as a joint account at Lloyds Bank PLC in the United Kingdom.  (*Id.* ¶ 10.)  Defendants later moved the account to Lloyds TSB Bank in Switzerland ("the Lloyds Account"), which is where the account was held during the period of 2010 to 2012.  (*Id.*)  The Lloyds Account was comprised of three components: (1) a cash account; (2) money market instruments and money market funds; and (3) securities.  (*Id.* ¶ 11.)

Defendants both had signatory authority over the Lloyds Account from its creation as a joint account in 1994 until it was closed in 2013.  (*Id.* ¶ 12.)  Defendants directed the bank and paid it a fee to retain all account related correspondence, or "keep mail," rather than having it sent to Defendants at their designated address in the United States, and also directed at least once that the bank send Catherine's credit card statements associated with the account to a family friend's address in Madrid.  (Gov't Ex. I, Docket No. 22-15; Gov't 56.1 ¶¶ 14, 22.)  A document

---

　　[2]   The Court relies on the parties' statements of undisputed material facts.  (Gov't Rule 56.1 Stmt. of Undisputed Material Facts ("Gov't 56.1"), Docket Entry No. 22-2; Defs.' Resp. to Gov't Rule 56.1 Stmt. of Undisputed Material Facts ("Defs.' 56.1 Resp."), Docket Entry No. 24.)

　　[3]   For ease of reference, the Court will refer to the parties by their given names.

from August of 2000 signed by Defendants directed Lloyds Bank to divest their U.S. securities. (Gov't 56.1 ¶ 17; Gov't Ex. K, Docket Entry No. 22-17.)

### ii.   Preparation of Defendants' joint federal income tax returns

Sidney Yoskowitz, Defendants' accountant, prepared and filed their original 2010, 2011, and 2012 federal income tax returns.  (Gov't 56.1 ¶ 23.)  Defendants worked with Yoskowitz for approximately forty years before his retirement.  (*Id.* ¶ 24.)  Yoskowitz's routine practice during the years he worked for Defendants was to send what he referred to as a "client organizer" to his clients every year to assist him in preparing their federal income tax returns.  (*Id.* ¶ 25.)  In the client organizer, Yoskowitz asked his clients, among other questions, if they had any foreign income.  (*Id.* ¶ 25.)  Defendants never returned the client organizer, but instead provided 1099 forms.  (*Id.*)

Defendants did not disclose the existence of the Lloyds Account to Yoskowitz when he prepared their original income tax returns for the tax years 2010, 2011, and 2012.  (*Id.* ¶ 27.)  Defendants did not provide Yoskowitz with any information about the Lloyds Account because, according to Juan, it was "not income in the United States" and Defendants "didn't feel the obligation that we have to this country with this account."  *Id.*

According to the government, after Yoskowitz prepared Defendants' 2010, 2011, and 2012 income tax returns, Defendants signed and returned them to Yoskowitz for filing with the IRS.  (*Id.* ¶¶ 28–29.)  Defendants contend that they did not review the 2010, 2011, and 2012 joint federal income tax returns for accuracy or sign them after Yoskowitz prepared them.  (*Id.* ¶ 29; Defs.' 56.1 ¶ 28–29.)  Defendants' joint federal income tax returns for the tax years 2010, 2011, and 2012 failed to disclose the existence of the Lloyds Account.  (Gov't 56.1 ¶¶ 31–32; Gov't Exs. O, Docket Entry No. 22-21, P, Docket Entry No. 22-22, and Q, Docket Entry No. 22-23.)

3

SPA-6

On Schedule B of their originally filed joint federal income tax returns for 2010, 2011, and 2012, the "no" box was checked in response to the question of whether Defendants had an interest in or a signature or other authority over a financial account (including bank accounts, securities account, or other financial account) in a foreign country. (*Id.* ¶ 32; Gov't Exs. O, P, Q.) Defendants failed to timely file an FBAR for the Lloyds Account for each of the tax years 2010, 2011, and 2012. (*Id.* ¶ 34.)

### iii.   Defendants' amended income tax returns and the Offshore Voluntary Disclosure Program

Defendants closed the account at the end of 2013 or early 2014, transferring all of the funds in the account to a J.P. Morgan Chase bank account in the United States. (*Id.* ¶ 15.) Defendants did not consult with any professional advisor, accountant (including Yoskowitz), or other advisor regarding the U.S. tax implications or reporting requirements for the Lloyds Account until late 2013, when Defendants consulted with an attorney in conjunction with the closing of the Lloyds Account and moving the funds to the United States. (*Id.* ¶ 35.) Juan testified during his deposition that he did not report the Lloyds Account because he believed that if you were a citizen of another country, and the money was generated in that country, then the United States did not have jurisdiction over the foreign account. (*Id.* ¶ 36.) His belief was based on a newspaper article written by an individual named "Robert Malta Grossman," once published in a Nicaraguan newspaper, and on conversations with individuals he identified as "international lawyers." (*Id.*)

Yoskowitz learned about Defendants' foreign income and the existence of the Lloyds Account in 2014 when Defendants' attorney asked Yoskowitz to prepare amended federal income tax returns for income tax years 2005 to 2014. (*Id.* ¶ 30.) The amended income tax

4

SPA-7

returns for 2010, 2011, and 2012 disclosed the existence of, and interest income from, the Lloyds Account. (*Id.* ¶ 39.)

In 2014, Defendants sought to participate in the Department of Treasury's Offshore Voluntary Disclosure Program ("OVDP") for tax years 2005 to 2012. (*Id.* ¶ 40.) On March 4, 2014, as part of OVDP, Defendants submitted Offshore Voluntary Disclosures to the IRS, disclosing the existence of the Lloyds Account from 2005 to 2012. (*Id.* ¶ 42.) Defendants admitted the account had a balance of between $1,000,000 and $2,500,000 from 2005 to 2012 and estimated the income the account made for those years was between $0 and $100,000. (*Id.*) As part of their participation in OVDP, in October of 2014, Defendants filed delinquent FBARs with amended income tax returns for 2010 to 2012. (*Id.* ¶ 43.) Defendants eventually withdrew from OVDP in October of 2016. (*Id.* ¶ 44.)

### iv.  The government's assessment of Defendants' FBAR violation penalties

Defendants consented to extend the time for the IRS to assess civil penalties under 31 U.S.C. § 5321 for the FBAR violations. (*Id.* ¶ 45.) Upon their withdrawal from OVDP, the IRS examined whether Defendants had willfully violated the requirement to file FBARs for 2010, 2011, and 2012. (*Id.* ¶ 46.) The IRS determined that Defendants willfully failed to timely report on an FBAR their financial interest in the Lloyds Account by the deadline for tax years 2010, 2011, and 2012. (*Id.* ¶ 47.)

In 2010, 2011, and 2012, the Lloyds Account had the following balances as of June 30 of the following year, respectively: $2,113,813, $2,064,258, and $2,101,330. (*Id.* ¶ 49.) Initially, the government determined that for tax years 2010 to 2012 the total willful FBAR penalty pursuant to the statutory maximum under 31 U.S.C. §§ 5321(a)(5)(C) and (D) for Defendants was $3,139,701 each. Using its discretion, the government determined that Defendants qualified

5

SPA-8

for mitigation. The government decided that appropriate FBAR penalties were $172,022 for 2010, $172,022 for 2011, and $172,021 for 2012 for each Defendant. These amounts were calculated by multiplying the June 30, 2012 account balance of $2,064,258 by 50%, then multiplying the resulting amount of $1,032,129 by 50% to account for each spouse's one-half ownership in the account, and then spreading the resulting amount of $516,065 evenly across years 2010, 2011, and 2012. (*Id.* ¶ 50.)

After Defendants submitted a formal protest and the IRS conducted an additional review, the IRS ultimately determined that an additional 20% discount would be appropriate. (*Id.* ¶ 51.) Thus, the assessments for FBAR penalties for each Defendant's failure to report the Lloyds Account were as follows: $140,017 for 2010, $140,017 for 2011, and $140,017 for 2012, totaling $420,051 each. (*Id.*) On October 9, 2019, Defendants each signed an IRS Form 13449, Agreement to Assessment and Collection of Penalties under 31 U.S.C. §§ 5321(a)(5) and 5321(a)(6), in which they each consented to the immediate assessment and collection of FBAR penalties totaling $420,051. (*Id.* ¶ 52.) On or about October 22, 2019, a delegate of the Secretary of the Treasury sent Defendants notice of the assessments of these FBAR penalties and demanded payment. (*Id.* ¶ 54.) As of February 21, 2023, the unpaid balance on the FBAR assessments for Defendants for 2010, 2011, and 2012, including failure to pay penalties, interest, and other statutory accruals under 31 U.S.C. § 3717, was $518,170.30 each. (*Id.* ¶¶ 55–56.)

    **b.  Procedural background**

The government filed the Complaint on October 7, 2021, alleging that Defendants willfully failed to file an FBAR to timely report their financial interest in a jointly-held foreign financial account for the tax years 2010, 2011, and 2012. (Compl. ¶¶ 7–9, 16, 32.) The government seeks statutory penalties and associated penalties and interest from each Defendant.

6

SPA-9

(Compl. at 8.)  On March 4, 2022, Defendants filed an answer to the Complaint.  (Answer, Docket Entry No. 8.)  On May 2, 2023, the government moved for summary judgment.  (Gov't Mot.)

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant."  *Miller v. N.Y. State Police*, No. 20-CV-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing

7

*Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127,

129 (2d Cir. 2013)).

> **b.   Defendants willfully violated 28 U.S.C. § 5314**

The government argues that the evidence supports a conclusion that Defendants willfully

failed to file an FBAR[4] because recklessness is sufficient to establish willfulness and the

undisputed evidence shows that Defendants acted recklessly.[5]  (Gov't Mem. 1–2, 16–18).  In

support, the government argues that the "evidence amassed to date establishes that the

Defendants' conduct is consistent with, and exceeds, the indicia of recklessness established in

the FBAR case law," because: (1) Defendants submitted federal income tax returns that falsely

stated they had no foreign financial accounts during the relevant tax years; (2) they failed to ask

their accountant about their responsibilities as to the Lloyds Account; (3) they understood that

interest income from a domestic bank is taxable under U.S. law; (4) they instructed the foreign

bank to hold mail related to the Lloyds Account and not invest in U.S. securities; (5) the Lloyds

Account was a significant percentage of their net worth during the years at issue; and

---

[4] Defendants do not dispute that they improperly failed to timely file FBARs for tax years 2010 to 2012.  (Defs.' Mem. 2.)  The parties dispute only whether Defendants' failure to file FBARs was willful.  (Gov't Mem. 1; Defs.' Mem. 2.)

[5] The government also argues that Defendant's affirmative defenses lack merit.  (Gov't Mem. 20–21.)  Defendants asserted the following affirmative defenses in their Answer: (1) failure to state a claim upon which relief can be granted; (2) a failure to show "willfulness or other requisite state of mind"; (3) "mistake"; (4) that the government's claims are barred by the statue of limitations; (5) "waiver, equitable estoppel, or laches"; (6) "recoupment or set off"; and (7) "any other matter constituting avoidance or affirmative defense." (Answer 4.)  Because Defendants do not argue that any of these affirmative defenses bar summary judgment in favor of the government, the Court declines to consider them. *See, e.g.*, *Arbitron Inc. v. Tralyn Broadcasting, Inc.*, 526 F. Supp. 2d 441, 447 (S.D.N.Y. 2007) ("A defendant is required to plead and adequately develop an affirmative defense during pretrial proceedings so that a district court can determine which claims, if any, may be disposed of by summary judgment." (citing *Kerman v. City of New York*, 374 F.3d 93, 111–12 (2d Cir. 2004)).

SPA-11

(6) Defendants are sophisticated taxpayers, part-owners in real-estate ventures, and individuals surrounded by professionals who "were in positions to either advise them about the implications of the foreign account, or at the very least point them in [the] right direction."  (Gov't Mem. 1–2, 16–18).

Defendants argue that 31 U.S.C. § 5321(a)(5) requires a showing that they intentionally violated the FBAR requirement and that there is a genuine dispute of fact as to whether they did so, because they did not review or sign their tax returns and they believed that they did not have to report the Lloyds Account.  (Defs.' Mem. 2–5; Defs.' 56.1 ¶ 32.)

Under 31 U.S.C. § 5314, "a United States person with an interest in foreign financial accounts having an aggregate value of more than $10,000 is required each year to file an FBAR." *United States v. Kahn*, 5 F.4th 167, 169 (2d Cir. 2021) (citing 31 U.S.C. § 5314; 31 C.F.R. § 1010.350(a); 31 C.F.R. § 1010.306(c)).  The government may collect civil penalties where an individual "violates, or causes any violation of, any provision of section 5314," 31 U.S.C. § 5321(a)(5)(A), and "[i]n the case of any person willfully violating, or willfully causing any violation of, any provision of section 5314," the government may collect civil penalties up to the greater of (1) $100,000, or (2) 50% of the balance in the unreported foreign account at the time of the violation, *id.* § 5321(a)(5)(C)–(D).  *See also Kahn*, 5 F.4th at 170 (noting that "for willful behavior," the maximum civil penalty "for failure to file an FBAR [is] the greater of $100,000 or 50 percent of the aggregate balance in the accounts at the time of the violation." (additional citation omitted) (citing 31 U.S.C. § 5321(a)(5)(C)(i))); *United States v. Mrvic*, 652 F. Supp. 3d 409, 411 (S.D.N.Y. 2023) ("United States citizens must file with the IRS [an FBAR] if they have an interest in a foreign bank or other financial account, and civil penalties attach for failure to abide by the FBAR reporting requirements." (citations omitted)); *Zuhovitzky v. UBS AG CHE*

*101.329.562*, No. 21-CV-11124, 2023 WL 4584452, at *9 (S.D.N.Y. July 18, 2023) ("[I]f a U.S. citizen 'willfully violat[es]' or 'willfully caus[es] a violation,' the penalty [for violating FBAR disclosure requirements] increases to either $100,000 or 50% of the amount in the assets in the unreported account at the time of the violation, whichever is higher." (second and third alterations in original) (quoting 31 U.S.C. § 5321(a)(5)(C)–(D))).  "To be found liable for a willful violation under 31 U.S.C. § 5321(a)(5), the United States must prove by a preponderance of the evidence that (1) [Defendants are] United States citizen[s]; (2) [Defendants] had an interest in, or authority over a foreign financial account; (3) the account had a balance exceeding $10,000.00 at some point during the reporting period; and (4) [Defendants] willfully failed to disclose the account and file [FBARs]."  *United States v. Schik*, No. 20-CV-2211, 2022 WL 685415, at *4 (S.D.N.Y. Mar. 8, 2022).

Although the Second Circuit has not yet addressed the meaning of "willful" in the context of Section 5321(a)(5), the Supreme Court has stated that "where willfulness is a statutory condition of civil liability," it will generally be construed to include "not only knowing violations of a standard, but reckless ones as well."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (collecting cases).  The Second Circuit has also held that, for the purposes of 26 U.S.C. § 6672, which provides penalties for willful failure to collect and pay withholding tax, an "individual's bad purpose or evil motive in failing to collect and pay the taxes 'properly play[s] no part in the civil definition of willfulness.'"  *Lefcourt v. United States*, 125 F.3d 79, 83 (2d Cir. 1997) (alteration in the original) (quoting *Hochstein v. United States*, 900 F.2d 543, 548 (2d Cir. 1990)).  Other courts in this Circuit have thus concluded that willfulness for purposes of Section 5321(a)(5) includes both knowing and reckless violations.  *See United States v. Katholos*, No. 17-CV-531, 2022 WL 3328223, at *8 (W.D.N.Y. Aug. 10, 2022) ("[W]illfulness includes

10

SPA-13

recklessness."); *Schik*, 2022 WL 685415, at *5 ("The Court agrees with the decisions of almost

every court, including those in this Circuit, that have considered the issue and now holds that a

'willful violation' includes reckless violations for purposes of a civil FBAR penalty."); *United

States v. Gentges*, 531 F. Supp. 3d 731, 743 (S.D.N.Y. 2021)  ("[F]or purposes of the civil

penalties provision in [Section] 5321(a)(5)(C)(i), a willful violation of the FBAR reporting

requirement includes both knowing and reckless violations of the statute."); *United States v.

Bernstein*, 486 F. Supp. 3d 639, 647 (E.D.N.Y. 2020) (noting that in the context of a failure to

file an FBAR, "recklessness is a subset of, or an alternative to, willfulness" (citing *Safeco Ins.*,

551 U.S. at 57)).

Other circuit courts have similarly concluded that "willfulness" for the purpose of Section

5321 includes reckless violations.  *See, e.g.*, *United States v. Rum*, 995 F.3d 882, 889 (11th Cir.

2021) ("[W]illfulness in [Section] 5321 includes reckless disregard of a known or obvious

risk."); *United States v. Horowitz*, 978 F.3d 80, 88 (4th Cir. 2020) ("[F]or the purpose of

applying § 5321(a)(5)'s civil penalty, a 'willful violation' of the FBAR reporting requirement

includes both knowing and reckless violations[.]"); *Norman v. United States*, 942 F.3d 1111,

1115 (Fed. Cir. 2019) ("[W]illfulness in the context of § 5321(a)(5)(C) includes recklessness.");

*Bedrosian v. United States*, 912 F.3d 144, 152 (3d Cir. 2018) ("*Bedrosian I*") (concluding that in

the context of failing to file an FBAR, "willfulness" covers "not only knowing violations of a

standard, but reckless ones as well" (internal quotation omitted)).  Consistent with all the courts

that have considered this issue, the Court finds that a showing that Defendants recklessly failed

to fail FBARs would result in civil penalties under Section 5321(a)(5)(C).

In the civil context, recklessness "encompasses an objective standard — specifically, 'the

civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act

11

in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Gentges*, 531 F. Supp. 3d at 744 (quoting *Horowitz*, 978 F.3d at 89); *Katholos*, 2022 WL 3328223, at \*8 (same).  In the context of Section 5321, "willfulness is established if 'the defendant (1) clearly ought to have known that (2) there was a grave risk that an accurate FBAR was not being filed and if (3) he was in a position to find out for certain very easily.'" *Katholos*, 2022 WL 3328223, at \*8 (quoting *Horowitz*, 978 F.3d at 89).

Construing the evidence in Defendants' favor, Defendants "entrusted the preparation and filing of their tax returns to their long-time accountant and did not review the tax returns or sign them prior to filing."  (Defs.' 56.1 ¶ 32.)[6]  Defendants argue that this demonstrates that their failure to file an FBAR was not willful.  (Defs.' Mem. 3.)  However, "most courts have held that where . . . a defendant provides false information regarding foreign bank accounts by failing to review carefully his income tax return, that defendant has shown reckless disregard toward, and thus has willfully violated, the FBAR reporting obligation."  *Gentges*, 531 F. Supp. 3d at 745–46 (collecting cases) (concluding that the defendant's admission that he filed his income tax return "without any significant substantive review . . . doom[ed] [his] argument on summary judgment"); *see also Kimble v. United States*, 991 F.3d 1238, 1242–43 (Fed. Cir. 2021) (concluding that the grant of summary judgment to the government was not clear error because

---

[6] (*See also* Gov't Ex. C, Dep. of Juan Reyes 165:5–16 (answering, in response to the question of whether Defendants' accountant sent the 2010 tax return to their house for Defendants to review and sign that "I think . . . because we['d] been doing that for 40 years . . . he probably trust[ed] us and we trust[ed] him" and stating that Defendants "[p]robably" reviewed and confirmed the accuracy of the original 2010 return prior to signing it), 176:16–19 (stating that the process for preparing the 2011 tax return was the same as for the 2010 tax return), 188:24–189:16 (same for 2012 tax return), Docket Entry 22-9; Gov't Ex. D, Dep. of Catherine Reyes 30:2–21 (stating that she did not review and confirm the accuracy of the income tax returns for 2010, 2011, or 2012 before faxing them back to Defendants' accountant), 37:89 (stating that if Defendants' accountant "sent it to me I signed it"), Docket Entry 22-10.)

the undisputed facts showed a willful violation where, among other things, the defendant did not review her tax returns before signing and filing them, and the tax returns stated that she had no foreign accounts); *Horowitz*, 978 F.3d at 90 (concluding that defendants acted recklessly in part because they "repeatedly failed to review the[ir] returns with the care sufficient at least to discover their misrepresentation of foreign bank accounts, while nonetheless stating that the returns were accurate" and that "such recklessness was only heightened by the fact that they understood that the tax returns represented only the information that they had provided to the[ir] accountant").[7] Defendants' failure to meaningfully review their tax returns before filing returns that inaccurately represented that they had no foreign accounts thus shows that they "recklessly disregarded the FBAR reporting obligation." *Gentges*, 531 F. Supp. 3d at 750.

In addition, the undisputed facts show other indicia of recklessness. First, Defendants never asked their "long-time accountant" to whom they "entrusted the preparation and filing of their tax returns" whether they were required to report their foreign account, nor did they inform him that the foreign account existed, despite his attempt to collect that information via his "client

---

[7] The lack of a physical signature on Defendants' tax returns for the years in question does not establish a genuine dispute of material fact. Defendants point to the fact that they did not physically sign the tax returns to support their argument that they did not review the tax returns before filing, not as evidence that they did not provide authorization for their accountant to file the returns. (*See* Defs.' Mem. 3 (identifying the "core fact at issue" as "[D]efendants' state of mind as to the requirement that they disclose a foreign bank account" and objecting to the government's "reliance upon [Defendants'] unsigned income tax returns as verified fact to establish their state of mind").) Defendants do not dispute that they authorized the filing of their tax returns.

Regardless, courts have held that an electronic signature in the form of a Personal Identification Number ("PIN") such as the one on Defendants' tax returns may suffice to serve as a taxpayer's signature. *See, e.g.*, *United States v. Lawrence*, 557 F. App'x 520, 530 (6th Cir. 2014) (concluding that because, among other things, the defendant did "not dispute that his PIN [was] on th[e] [tax] returns or that he authorized [his accountant] to e-file his returns," his PIN provided a sufficient basis for a jury to conclude that he had "subscribed" his name to the tax returns for purposes of his violation of 26 U.S.C. § 7206(1)).

organizer" questionnaires. (Defs.' 56.1 ¶ 32; Gov't 56.1 ¶¶ 24–25, 27, 35); *see, e.g., Gentges*, 531 F. Supp. 3d at 750–51 (noting that "courts have repeatedly held" that where a defendant does not disclose the existence of his foreign accounts or seek advice from his tax preparer regarding the accounts, "such an omission constitutes evidence of recklessness or willful blindness toward the FBAR reporting obligation"); *Horowitz*, 978 F.3d at 90 (affirming the grant of summary judgment in favor of the government where, among other things, the defendants failed to ask their accountant about their reporting requirements for their foreign account); *Kimble*, 991 F.3d at 1242–43 (concluding that the grant of summary judgment to the government was not clear error because the undisputed facts showed a willful violation where, among other things, the defendant "knew about the numbered account and took efforts to keep it secret by . . . not disclosing the account to her accountant"). Defendants point to the fact that they relied on a news article in a Nicaraguan newspaper and informal conversations with "international lawyers" outside of the United States for their understanding that they did not have to report their foreign account, but "a defendant's subjective belief does not negate a finding of recklessness or willful blindness, particularly where, as here, a defendant could easily have determined whether his belief was accurate by speaking with a longtime tax preparer." *Gentges*, 531 F. Supp. 3d at 750; *see also Horowitz*, 978 F.3d at 89 ("[The defendants'] only explanation for not disclosing foreign interest income related to some unspecified conversations they had with friends in Saudi Arabia in the late 1980s. Yet, if the question of whether they had to pay taxes on foreign interest income was significant enough to discuss with their friends, they were reckless in failing to discuss the same question with their accountant at any point over the next 20 years.").

Second, although Defendants assert that they "do not recall ever having requested that Lloyds Bank keep mail related to their account," it is undisputed that they paid a fee to the

14

SPA-17

Lloyds Account for a "keep mail" service, under which the bank retained all account-related correspondence, rather than sending it to Defendants at their designated address in the United States.  (Defs.' 56.1 ¶ 14; Gov't 56.1 ¶ 14.)  Defendants also do not dispute that they signed documents directing the bank to sell all of their U.S. securities and not invest in further U.S. securities.[8]  (Gov't 56.1 ¶ 17; Defs.' 56.1 ¶ 17; Gov't Ex. K); *see also Gentges*, 531 F. Supp. 3d at 751 ("Also significant is the fact that both of [d]efendant's foreign accounts were set up as numbered accounts with 'hold mail' service."); *Horowitz*, 978 F.3d at 90 (noting the defendants' use of the "hold mail" service for their foreign account); *Bedrosian v. United States*, 42 F.4th 174, 180 (3d Cir. 2022) ("*Bedrosian II*") (noting that the defendant's foreign accounts were subject to a "mail hold" and that the undisputed facts of "the existence of the mail hold or that he signed a form and paid a fee to the bank for this benefit" were relevant to the question of whether he had willfully violated the FBAR reporting requirement); *Norman*, 942 F.3d at 1116 (concluding that, among other things, the defendant's signing of a "document preventing [her bank] from investing in U.S. securities on her behalf" was a step that "had the effect of inhibiting disclosure of the account to the IRS").

Finally, it is also undisputed that the balance of the Lloyds Account represented between 75% and 90% of Defendants' wealth during the years in question.  (Gov't 56.1 ¶ 16; Defs.' 56.1 ¶ 16); *see Gentges*, 531 F. Supp. 3d at 752 (noting that the size of the accounts in question "were by no means small or insignificant and thus susceptible to being overlooked by" the defendant (quoting *Horowitz*, 978 F.3d at 90)); *Bedrosian II*, 42 F.4th at 180 (noting that the defendant had

---

[8] Defendants dispute only their intent in signing the form, asserting that the form "does not explicitly state that [Defendants] requested this for the purpose of avoiding U.S. income tax withholdings."  (Defs.' 56.1 ¶ 17.)

SPA-18

"also acknowledged that he was aware of the significant amount of money held in his foreign bank accounts").

Defendants' undisputed failure to review their incorrect tax returns in advance of the filing of the returns, as well as the additional undisputed evidence, demonstrate that they acted, at a minimum, recklessly when they failed to file FBARs in 2010, 2011 and 2012, and they are therefore subject to enhanced penalties for a willful violation under 31 U.S.C. § 5321(a)(5)(C). Accordingly, the Court grants the government's motion for summary judgment.

### c.   Penalty

Under 31 U.S.C. § 5321(a)(5)(C)(i), as a result of a willful violation of the FBAR filing requirement, a defendant can be subject to a maximum civil penalty of "the greater of $100,000, or 50 percent of" the balance of the account at the time of the violation. *See Kahn*, 5 F.4th at 170 (noting that "for willful behavior," the maximum civil penalty "for failure to file an FBAR [is] the greater of $100,000 or 50% of the aggregate balance in the accounts at the time of the violation." (citing 31 U.S.C. § 5321(a)(5)(C)(i))). The Internal Revenue Manual ("Manual") states that the "violation date" for FBAR violations in calendar years 2015 and earlier occurs on "June 30th of the year following the calendar year for which accounts must be reported." Manual § 4.26.16.5.2(2); *see also Gentges*, 531 F. Supp. 3d at 752 ("Under the Internal Revenue Manual, '[t]he date of a violation for failure to timely file an FBAR is the end of the day on June 30th of the year following the calendar year for which the accounts are being reported[,]' and thus, '[t]he balance in the account at the close of June 30th is the amount to use in calculating the filing violation.'" (alterations in original) (quoting Manual § 4.26.16.6.5)).

SPA-19

The government asserts, and Defendants do not dispute, that each Defendant is subject to a penalty of $420,051,[9] and that the unpaid balance for each Defendant as of February 21, 2023, including failure to pay penalties, interest, and other statutory accruals under 31 U.S.C. § 3717, is $518,170.30.[10]  (Gov't 56.1 ¶¶ 55–56; Defs.' 56.1 ¶¶ 45–46; Cox Decl. ¶¶ 4–5.)  Because Defendants do not challenge the government's assessment, and there is nothing in the record to suggest that the government failed to calculate the penalties in line with its own internal guidelines, or inappropriately exercised its discretion in reducing the maximum penalties, there is no basis to conclude that the penalties are arbitrary or capricious.  The Court therefore grants the government's summary judgment motion as to the penalties assessed against each Defendant.

---

[9] Defendants do not dispute that on the violation date for the 2010 FBAR reporting violations, the Lloyds Account had a balance of $2,113,813; for the 2011 FBAR reporting violations, the Lloyds Account had a balance of $2,064,258; and for the 2012 FBAR reporting violation, the Lloyds Account had a balance of $2,101,330.  (Gov't 56.1 ¶ 49; Defs.' 56.1 ¶ 48–56.)  Multiplying each of these amounts by 50%, the maximum penalty is $1,056,907 for the 2010 violation; $1,032,129 for the 2011 violation; and $1,050,665 for the 2012 violation.  (Gov't Ex. DD 17, Docket Entry No. 22-36; Gov't Ex. EE 17, Docket Entry No. 22-37.)  As a result, the government determined that the maximum penalty under § 5321(a)(5)(C)(i) was $3,139,701 for each Defendant.  (Gov't. 56.1 ¶ 50.)

The government, in its discretion, determined that the maximum penalty was "too severe," and instead determined that for each Defendant the appropriate penalty would be $175,022 for the 2010 violation; $175,022 for the 2011 violation; and $175,021 for the 2012 violation.  (Gov't Ex. DD 6; Gov't Ex. EE 6.)  These amounts were reached by taking 50% of the account balance as of June 30, 2012, the violation date for the 2011 violation, and then further reducing that balance by 50% to represent each Defendant's 50% ownership of the account, resulting in a total penalty of $516,065, which the government then spread evenly over the 2010 through 2012 tax years.  (Gov't Ex. DD 6; Gov't Ex. EE 6; Gov't 56.1 ¶ 50.)  The government then reduced the penalties by an additional 20% each after Defendants submitted a formal protest, resulting in final penalties for each Defendant's willful FBAR reporting violation of $140,017 for 2010; $140,017 for 2011; and $140,017 for 2012.  (Gov't 56.1 ¶ 51; Gov't Ex. FF, Docket Entry No. 22-38; Gov't Ex. GG, Docket Entry No. 22-39.)  The total penalty for each Defendant was therefore calculated to be $420,051.  (Cox Decl. ¶¶ 4–5, Docket Entry No. 22-3.)

[10] The government asserts that each balance of $518,170.30 includes $420,051 due from the FBAR penalty, $14,017.04 due in interest, and $84,102.26 due as a late-payment penalty under 31 U.S.C. § 3717(e)(2).  (Cox Decl. ¶¶ 4–5.)

17

SPA-20

*See Gentges*, 531 F. Supp. 3d at 752 (noting that IRS penalty calculations are reviewed "for abuse of discretion under the 'arbitrary and capricious' standard of the Administrative Procedure Act," and granting summary judgment with respect to the penalty calculation for a bank account for which the defendant did not dispute the penalty calculation); *Rum*, 995 F.3d at 895 (concluding that because the IRS's actions in determining the defendant's FBAR penalty were not improper, they were not arbitrary and capricious).

### III.  Conclusion

For the reasons stated above, the Court grants the government's motion for summary judgment.

Dated: January 10, 2024
        Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

SPA-21

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff,                    **MEMORANDUM & ORDER**
                                                           21-CV-5578 (MKB)
              v.

JUAN REYES and CATHERINE REYES,

                              Defendants.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

          Plaintiff the United States of America commenced the above-captioned action against

Defendants Dr. Juan Reyes and Catherine Reyes on October 7, 2021, asserting claims pursuant

to 31 U.S.C. §§ 3711(g)(4)(C) and 5321(a)(5) to collect outstanding civil penalties it alleged

Defendants owe due to their failure to timely file a Report of Foreign Bank and Financial

Accounts ("FBAR") to report their financial interest in a jointly-held foreign financial account

from 2010 to 2012.  (Compl. ¶¶ 7–9, 16, 32, Docket Entry No. 1.)  On May 2, 2023, the

government moved for summary judgment, and on January 10, 2024, the Court granted the

government's motion as to Defendants' liability and the penalty sought by the government in the

amount of $518,170.30 against each Defendant (the "January 2024 Decision").  (Mem. and

Order dated Jan. 10, 2024 ("Jan. 2024 Decision") 7, 16, 18, Docket Entry No. 25.)  The

$518,170.30 sought against each Defendant included the $420,051 FBAR penalty, $14,017.04

due in pre-judgment interest as of February 21, 2023, and $84,102.26 in late-payment penalties

pursuant to 31 U.S.C. § 3717(e)(2) as of February 21, 2023.  (*Id.* at 17 & n.10.)  On January 23,

2024, the Court closed the case.  (*See* Case Termination dated Jan. 23, 2024.)

On January 24, 2024, the government moved the Court to reopen the case and enter judgment against each Defendant for (1) the $518,170.30 awarded in the January 2024 Decision, (2) pre-judgment interest accruing after February 21, 2023 pursuant to 31 U.S.C. § 3717(a)(1), (3) post-judgment interest pursuant to 28 U.S.C. § 1961(a) until the judgment is fully paid, and (4) late-payment penalties accruing after February 21, 2023 and until payment in full, pursuant to 31 U.S.C. § 3717(e)(2).[1]  Defendants oppose the motion only as to the application of a six percent late-payment penalty rate pursuant to 31 U.S.C. § 3717(e)(2), arguing that the Court should, in its discretion, apply a lower penalty rate given equitable considerations including Defendants' ages and financial circumstances.[2]  (Defs.' Opp'n 1–2.)

For the reasons discussed below, the Court grants the government's motion.

## I. Discussion

Defendants argue that the Court should decline to apply late-payment penalty interest at a rate of six percent, and instead should apply a "much lower amount, guided by the [C]ourt's discretion."  (Defs.' Opp'n 1.)  In support of their argument, Defendants contend that 31 U.S.C. § 3717(e)(2) leaves the determination of the penalty amount to the Court's discretion.  (*Id.*)  Defendants also argue that they are "already to be drastically penalized" by the Court's grant of summary judgment, due to the amount of the FBAR penalty, Defendants' ages, and their financial circumstances.  (*Id.* at 2.)

The government argues that the Court should not deviate from the six percent annual late-payment penalty rate because the late-payment penalty is mandatory by law and, pursuant to 31

---

[1]  (Gov't Mot. to Reopen Case and Enter J. ("Gov't Mot."), Docket Entry No. 26; Proposed J., Docket Entry No. 26-1; Gov't Reply in Supp. of Gov't Mot. ("Gov't Reply"), Docket Entry No. 30; Defs.' Opp'n to Gov't Mot. ("Defs.' Opp'n"), Docket Entry No. 29; Defs.' Sur-reply in Supp. of Defs.' Opp'n ("Defs.' Sur-reply"), Docket Entry No. 31.)

[2]  As a result, the Court grants without discussion the government's motion as to its remaining requests.

2

SPA-23

U.S.C. § 3717(e)(2), the Department of Treasury has exercised its regulatory discretion in setting the rate at six percent.  (Gov't Reply 1–3.)

Under 31 U.S.C. § 3717(e)(2), the head of a federal agency is required to assess a late-payment penalty, not to exceed a rate of six percent a year, on debt outstanding for more than ninety days.  *See* 31 U.S.C. § 3717(e)(2) ("The head of an executive, judicial, or legislative agency shall assess on a claim owed by a person . . . a penalty charge of not more than 6 percent a year for failure to pay a part of a debt more than 90 days past due."); *see also United States v. Garrity*, No. 15-CV-243, 2019 WL 1004584, at *9 (D. Conn. Feb. 28, 2019) (quoting the same).  The Department of Treasury in turn has set a minimum rate to be applied, and has determined that penalties under this section "shall accrue at the rate of 6% per year, or such other higher rate as authorized by law."  31 C.F.R. § 5.5(a); *see also United States v. Sinyavskiy*, No. 21-CV-2757, 2022 WL 3588163, at *5 (E.D.N.Y. July 29, 2022) ("Pursuant to 31 U.S.C. § 3717(e)(2) and 31 C.F.R. §§ 5.5(a) and 901.9, the Secretary of the Treasury shall assess a late-payment penalty charge of 6% per year for debt more than 90 days past due."), *report and recommendation adopted*, 2022 WL 4662789 (E.D.N.Y. Sept. 30, 2022).  "[W]henever Congress has 'explicitly left a gap for the agency to fill,' the agency's regulation is 'given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute.'"[3]  *See Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239 (2004) (second alteration in original) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984)); *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) ("When Congress has 'explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' and any ensuing regulation is binding in the courts unless

---

[3]  Defendants have not challenged the regulation itself.

3

procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." (quoting *Chevron*, 467 U.S. at 843–44)); *Brown v. N.Y.C. Dep't of Educ.*, 755 F.3d 154, 161 n.4 (2d Cir. 2014) (quoting *Mead Corp.*, 533 U.S. at 227 for the same).

In addition, federal agencies are required to apply a late-payment penalty pursuant to 31 U.S.C. § 3717 to an unpaid FBAR penalty. *See, e.g.*, *United States v. Collins*, 36 F.4th 487, 496 (3d Cir. 2022) (concluding that "[section] 3717 controls — and requires — the imposition of pre-judgment interest and penalties" on an FBAR penalty debt); *Garrity*, 2019 WL 1004584, at *9 (applying section 3717(e)(2) to an unpaid FBAR penalty and noting that "[f]ederal agencies must assess a late payment penalty 'of not more than 6 percent [a] year for failure to pay [a] part of a debt more than 90 days past due'" (quoting 31 U.S.C. § 3717(e)(2))); *United States v. Toth*, No. 15-CV-13367, 2020 WL 5549111, at *8 n.8 (D. Mass. Sept. 16, 2020) (applying section 3717(e)(2) to an FBAR penalty and noting that "[a]lthough the addition of late fees and interest increases the penalty assessed by approximately $1 million, this Court and the Department of the Treasury do not have discretion to reduce the penalty by these additional sums" (citing, *inter alia*, 31 U.S.C. § 3717(e))); *cf. United States v. Texas*, 507 U.S. 529, 536 (1993) (distinguishing the common law duty to pay pre-judgment interest, which "is by no means automatic," from the duty under 31 U.S.C. § 3717(a), which *requires* federal agencies to collect prejudgment interest against persons and specifies the interest rate," and 31 U.S.C. §§ 3717(e)(1) and (e)(2), which "[u]nlike the common law, . . . impose[] processing fees and penalty charges").

Defendants have pointed to no authority, and the Court has found none,[4] indicating that it has the ability, in its discretion, to reduce the amount of a penalty applied pursuant to section

---

[4] At a status conference held on May 3, 2024, the Court directed the parties to submit additional case law, if any, on the issue of whether the Court has the discretion to apply a late-payment penalty rate of less than six percent. (Min. Entry dated May 3, 2024.) Defendants in their supplemental letter identified two cases that they assert support a conclusion that the Court

SPA-25

3717.  The Court therefore denies Defendants' motion to reduce the prescribed six percent late-payment penalty, and applies the late-payment penalty at a rate of six percent to Defendants' outstanding debt.[5]

The Court therefore grants the government's motion to reopen the case and enter judgment in the requested amount.

---

may, in its discretion, reduce the late-payment penalty to below six percent. (Defs.' Suppl. Letter 1–3, Docket Entry No. 34.) Neither of these cases, however, support Defendants' claim. *See United States v. Hughes*, No. 18-CV-5931, 2023 WL 2393780, at \*12 (N.D. Cal. Mar. 6, 2023) (concluding that late-payment penalties did not apply to the initial amount stated in a demand letter for FBAR penalties where the amount sought in the demand letter was subsequently found to be arbitrary and capricious); *Garrity*, 2019 WL 1004584, at \*9 (applying a six percent late-payment penalty fee under 31 U.S.C. § 3717(e)(2)).

Defendants further appeared to raise for the first time in their supplemental letter an argument that the application of the FBAR penalties and other statutory fees and penalties are violative of their Eighth Amendment rights. (Defs.' Suppl. Letter.) Because Defendants have not previously raised this argument, however, it is waived. *See, e.g.*, *United States v. Morgan*, 406 F.3d 135, 136 n.1 (2d Cir. 2005) (deeming an argument waived where it was raised for the first time in response to a request for supplemental briefing on a different issue); *McPhee v. Gen. Elec. Int'l, Inc.*, 736 F. Supp. 2d 676, 681 (S.D.N.Y. 2010) ("Because [the p]laintiff waited to raise this argument until the [c]ourt had reviewed the submissions on the motion . . . and authorized . . . supplemental briefing on one specific narrow question, the argument has been waived.").

[5]  The government also argues that Defendants can only obtain a waiver of the late-payment penalty by making a request to the Deputy Chief Financial Officer of the Department of Treasury, and appealing any denial to the Assistant Secretary (Management)/Chief Financial Officer of the Department of Treasury. (Gov't Reply at 3–4); *see also* 31 C.F.R. § 5.5(b) ("Treasury entities may waive interest, penalties, and administrative costs, or any portion thereof, when it would be against equity and good conscience . . . in accordance with Treasury guidelines for waiving claims . . . ."); 31 C.F.R. pt. 5, app. A (noting that "Treasury's Deputy Chief Financial Officer is delegated the authority to waive, in whole or in part, a claim of the United States . . . aggregating \$5,000 or more per claim" and that "[r]equests for waiver of claims aggregating \$5,000 or more per claim which are denied in whole or in part may be appealed to the Assistant Secretary (Management)/Chief Financial Officer"). Defendants do not argue that they have made a waiver request to the Deputy Chief Financial Officer of the Department of Treasury, or that they appealed a denial of a waiver request to the Assistant Secretary (Management)/Chief Financial Officer. Rather, Defendants contend that they raised objections to the government's imposition of the penalties on grounds of equity and good conscience, and point to letters they sent to the government in 2019 generally objecting to the FBAR penalty as well as "the taxes, interest and 20% miscellaneous penalties." (Defs.' Sur-reply 1–2.) Because Defendants have not raised a claim of denial of a waiver request, the Court does not decide whether any such appeal would be reviewable by the Court.

SPA-26

**II.   Conclusion**

The Court grants the government's motion to reopen the case and directs the Clerk of Court to enter judgment against (1) Dr. Juan Reyes in the amount of $518,170.30 plus statutory additions, including (a) interest accruing pursuant to 31 U.S.C. § 3717(a)(1) from and after February 21, 2023, until the date of entry of the judgment, (b) interest accruing pursuant to 28 U.S.C. § 1961(a) from and after the date of entry of the judgment until the judgment is fully paid, and (c) late-payment penalties accruing pursuant to 31 U.S.C. § 3717(e)(2) from and after February 21, 2023, until the judgment is fully paid; and (2) Catherine Reyes in the amount of $518,170.30 plus statutory additions, including (a) interest accruing pursuant to 31 U.S.C. § 3717(a)(1) from and after February 21, 2023, until the date of entry of the judgment, (b) interest accruing pursuant to 28 U.S.C. § 1961(a) from and after the date of entry of the judgment until the judgment is fully paid, and (c) late-payment penalties accruing pursuant to 31 U.S.C. § 3717(e)(2) from and after February 21, 2023, until the judgment is fully paid.

Dated: May 21, 2024
        Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

6